# IN THE OREGON TAX COURT

## FALCON MANUFACTURING CORPORATION
*v.*
## DEPARTMENT OF REVENUE
(TC 2483)

Laurence E. Thorp, Thorp, Dennett, Purdy, Golden & Jewett, P.C., Springfield, represented plaintiff.

Joseph A. Laronge, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered March 4, 1987.

### CARL N. BYERS, Judge.

Plaintiff appeals the assessed value of its plywood plant as of January 1, 1984, and January 1, 1985. The property in question consists of the buildings, machinery and equipment constituting a small lay-up plant located in Eugene, Oregon. Lacking a sander or patching machine, the plant produces only rough sheathing. Plaintiff does not own the land on

which the plant is located and the value of the land is not in issue.

The subject plant was originally constructed during the 1940's. As usual, with a plant this old, it has passed through numerous phases and ownerships. Plaintiff purchased the property in November 1982 after the plant had been closed for approximately two years. Plaintiff paid a purchase price of $647,000 for the buildings, machinery and equipment. At the same time plaintiff executed a written lease agreement for seven years for the land with the owner of the land. Plaintiff's evidence indicated that it purchased the property at what it considered to be the "bottom of the market." Plaintiff knew at the time it purchased the property that it would be necessary to make some improvements.

Contrary to plaintiff's expectations, the plywood market did not improve as much or as rapidly as anticipated and the plant was not as efficient as anticipated. It was apparent from the testimony that plaintiff felt somewhat misled as to the operating costs and the need to comply with environmental standards for pollution. As a consequence, in addition to what might be viewed as normal start-up expenses and repairs for a plant that had been closed for two years, plaintiff was required to immediately install a scrubber system for air pollution. When plaintiff experienced fuel costs in excess of two to three times those expected, it felt compelled to modify its dryers. All told, during plaintiff's first year of operation, it made major changes to some of the existing equipment and added additional equipment, investing by its own report $1,553,585. During 1984, plaintiff invested another $226,734, resulting in a total investment in the plant of $2,427,319.

After hearing, the defendant sustained assessed values of $2,466,440 for the value of the property as of January 1, 1984, and $2,425,680[1] as of January 1, 1985. Plaintiff contends that these amounts are excessive and that the true cash value of the plant was $780,000 for both 1984 and 1985.

---

[1] Plaintiff's complaint alleges that the Board of Equalization sustained a value of $2,520,440 as of January 1, 1985, but the Opinion and Order states the true cash value for January 1, 1985, was $2,425,680.

Plaintiff's appraiser was both articulate and experienced in the valuation of plywood plants. Lacking any meaningful income data for the property, he discarded the income approach and utilized both a market approach and a cost approach. His cost approach was based on replacement cost used, utilizing data from the used equipment market. He did not separately appraise the buildings and improvements to the land but indicated that the county's original value of approximately $390,000 (before economic obsolescence) was acceptable. Plaintiff's appraiser, because of economic obsolescence, reduced this to $156,000 in allocating his final estimate of value. (Exhibit 6, at 25.) For reasons indicated below, the appraiser did not give any weight to the cost approach, but relied entirely upon his market approach.

Plaintiff's appraiser found eight sales of plywood plants which he thought to be comparable, one of which was the sale of the subject property to plaintiff. However, he did not use a traditional comparison approach where two or more like properties are compared and adjusted for their differences. Instead, plaintiff's appraiser concluded that productive capacity is the basic measure used in the marketplace to determine purchase price. Accordingly, after deleting the land and other nonplywood production assets, he analyzed the eight comparable sales on the basis of their purchase price compared to their actual productive capacity. He explained that the standard measure for production in the plywood industry is the number of square feet (surface area) produced on a three-eighths inch thickness basis. If plywood is produced in a thickness other than three-eighths inch, the surface area of the thicker plywood is multiplied by a factor to reflect the increased thickness.

The approach taken by plaintiff's appraiser is theoretically comparable to a gross rent multiplier utilized in comparing income-producing real property. It is apparent that the validity of such an approach depends upon the importance of the factor or unit of comparison and the uniformity of the properties involved.

"A multiplier is usually employed as a unit of comparison in applying the sales comparison approach in the valuation of income-producing properties. Because multipliers tend to remain fairly constant over a period of time and are used only for properties exhibiting a high degree of uniformity, they can

be derived from market data without adjustments. However, an analysis of property differences can be very helpful in revealing price patterns and in explaining any variance in multipliers." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 314 (8th ed, 1983).

In this case the court cannot give to plaintiff's market approach the weight that it might otherwise give to a detailed comparison of comparable sales. The evidence indicated that the comparable sales did not have "a high degree of uniformity" but varied significantly in price as well as in such factors as location, layout, age, size and related equipment. Under these circumstances, the approach is too imprecise in its indication of value.

The court is not persuaded that plaintiff's multiplier of $10,000 per million square feet of capacity is accurate. Statistically, the range of $3,328 to $13,617 is too great in a sample of eight to create any sense of confidence. Furthermore, and more importantly, the end result is not reasonable. Plaintiff purchased at arm's-length sale a plant for $647,000. After adding $1,750,000 in improvements, which increased productive capacity as well as operating efficiency, plaintiff's approach indicates an increase in value of only $133,000. Further, while not drastically improved, it appears that the plywood market as of January 1, 1984, and January 1, 1985, was better than in 1982. Thus, even admitting that plaintiff may have made a serious mistake in judgment, the evidence indicates that the subject property has to be worth more than $780,000.

■     One possible area where plaintiff's appraiser may be in error is his reliance upon the assessed value for the land. In his analysis of the comparable sales, he utilizes the assessed value for land even though in each case the total assessed value for the whole property is substantially in excess of the sale price. His rationale is that any "loss in value" must be attributed only to the improvements and not to the land. However, in the absence of a separate appraisal of the land value, it would seem more reasonable that any decrease in value should be proportionate rather than assigned only to the improvements.

On the other hand, plaintiff's evidence of comparable sales demonstrates that during the relevant time periods,

plywood plants, often with substantial amounts of land and additional equipment such as a sander line, sold for less than the subject's assessed value. In one sense, then, superior or more substantial properties sold for less than the subject. This data would indicate that the value indicator arrived at by the cost approach is too high and probably does not reflect all of the economic and functional obsolescence otherwise present. Defendant disputes both the comparability of the sales and the presence of any obsolescence not already reflected in the price of used equipment.

Defendant also questioned the condition of the equipment in the comparable sale plants, arguing that deferred maintenance prior to closing rendered the equipment of lesser value than the subject. While there was some evidence and much speculation about deferred maintenance for closed plants, the court is not persuaded that such is a major factor where most of the plants closed due to excess labor costs. Moreover, there may be significant obsolescence in an integrated plant not reflected in the prices of used equipment. In an industry which has suffered such major swings as the plywood industry in Oregon, the location, layout, changes in the raw material market, and many other factors can drastically affect the value of an established plant. For these reasons and others, the court is persuaded that the comparable sales demonstrate an outer limit of value not reflected in the cost approach.

Defendant's appraiser did not use the income approach or the market comparison approach. He testified that he did not believe there were any comparable sales of plywood plants. His reasoning appeared to be that the market's primary concern in valuing plywood plants is not operating capacity, as plaintiff's appraiser believed, but operating costs. Since costs vary from plant to plant, defendant's appraiser did not believe any plants were comparable to the subject. Aside from the fact that defendant's investigation of the comparable sales left much to be desired, his rationale would never allow any comparable sales. This position, plus the appraiser's responses on cross-examination concerning the sale prices of the other plants, seems to indicate a lack of objectivity.

On the whole, the court finds itself relying primarily

upon defendant's reproduction cost used appraisal. In this approach, defendant's appraiser utilized prices of equipment from the used equipment market. To these prices, he added the costs of shipping and installation. Since the equipment is not new, the installation costs must be depreciated to bring them in line with the life expectancy of the equipment. However, while defendant's appraiser depreciated transportation and labor costs, he did not depreciate the wiring, foundation or special costs. This is a significant error.

Defendant's appraiser also failed to depreciate the property from January 1, 1984, to January 1, 1985. In an industry where the expected recovery of capital involves such a short time period, it would seem that there must be significant depreciation during a one-year period. By failing to allow any depreciation, defendant's appraiser is assuming that the plant will go on forever at the same value. The evidence shows the contrary. Constant changes and improvements to existing equipment are needed and even new equipment can lose value quickly due to market changes.

According to the court's calculations, if just the wiring, foundations and special costs were depreciated 75 percent, which appears to be the same depreciation applied to transportation and labor, the resulting value indicator would be $402,000 less than that found by defendant's appraiser. It may be that a deduction should also be made for functional or economic obsolescence. However, neither appraiser attempted to specifically measure any functional obsolescence suffered by the plant as a single unit. It does appear that the value indicated by the cost approach, as adjusted by the court, is consistent with the range of values indicated by the selling prices of plaintiff's comparable sales.

Based upon the above, the court finds that the true cash value of the subject property for the years in question is as follows:

| Item | January 1, 1984 | January 1, 1985 |
|---|---|---|
| Buildings & Structures | $ 461,150 | $ 461,150 |
| Machinery & Equipment | 1,000,000 | 1,200,000 |
| Total | $1,461,150 | $1,661,150 |

Costs to neither party.